**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

MELISSA FARRIS,

Defendant.

Case No. 26-mj-140

**MEMORANDUM ORDER**

Melissa Farris stands charged by criminal complaint with two felony offenses: (1) willful injury or depredation of property of the United States in violation of 18 U.S.C. § 1361; and (2) destruction of a veterans' memorial in violation of 18 U.S.C. § 1369. The charges stem from Ms. Farris's alleged vandalism of the World War II Memorial on the National Mall by placing bubbles into the Memorial's fountain and spray-painting part of its facade, including with the phrase, "Clean Hands Dirty $." After finding probable cause to believe Ms. Farris committed the charged offenses, this Court approved a criminal complaint and issued a warrant for her arrest. But as it happens, Ms. Farris greatly simplified the U.S. Marshals' job in executing on that warrant because she voluntarily turned herself into law enforcement that same morning. During her first appearance in this courthouse, the government moved for Ms. Farris's detention pending trial and asked the Court to schedule a detention hearing under 18 U.S.C. § 3142(f)(2)(A), which provides that a court "shall" hold such a hearing in a case that involves "a serious risk that [the defendant] will flee." Following argument, the Court **DENIED** the government's motion for a detention hearing and released Ms. Farris while she awaits trial, subject to various conditions imposed pursuant to 18 U.S.C. § 3142(c)(1)(B). The Court largely explained its ruling from the bench. This Memorandum Order supplements that decision.

## BACKGROUND

Given the early posture of this case, the Court recites the relevant background based on the allegations in the sworn affidavit accompanying the government's criminal complaint.

The World War II Memorial is part of the National Mall and honors the millions of American service members who bravely served this nation during World War II. On the afternoon of Thursday August 13, 2026, at approximately 2:00 PM, members of the U.S. Park Police ("USPP") and U.S. Park Rangers responded to a call about a disorderly person disrupting visitors around the World War II Memorial. Upon arriving at the scene, a Park Ranger observed a substantial amount of foam bubbles in one of the memorial's fountains. More, one of the balcony walls of the memorial had been sprayed painted with the words "Clean Hands Dirty $" in orange-colored paint, with additional green-colored and pink-colored paint sprayed and splattered nearby. A witness who observed at least part of the vandalism took a photograph of the suspect, which he provided to law enforcement. After USPP circulated the photograph, a USPP officer recognized the individual as someone they had cited a few days earlier for improperly camping on federal property, not far from the World War II Memorial. That individual was Ms. Farris.

Ms. Farris apparently maintains a public profile on Facebook and Instagram. Law enforcement reviewed those publicly available social media accounts and identified videos that Ms. Farris appears to have created, including several showing the World War II Memorial's fountain filled with bubbles and a nearby wall marked with spray paint. In one video, Ms. Farris can reportedly be heard telling the camera, "Nobody cares, why doesn't anybody care, this is unreal." In another, Ms. Farris can reportedly be heard saying, "I was just allowed to deface Federal f***ing property, and nobody batted an eye, and that is very strange."

According to the government's affidavit in support of the charges, a preliminary estimate of the cost to clean up and restore the World War II Memorial exceeds $1,000.00.

* * *

Based on these representations, this Court approved a criminal complaint and an arrest warrant for Ms. Farris, charging her with: (1) willful injury and depredation of property of the United States in violation of 18 U.S.C. § 1361; and (2) destruction of a veterans' memorial in violation of 18 U.S.C. § 1369. (*See* ECF No. 1, Compl.) The complaint and arrest warrant were docketed around 11:30 AM on Friday August 14, 2026. But a couple hours earlier—at approximately 9:30 AM that same day—Ms. Farris had voluntarily surrendered herself at the U.S. District Court for the Eastern District of Virginia in Alexandria, Virginia, just across the Potomac River from Washington, D.C. Once the U.S. Marshals Service processed the arrest warrant, Ms. Farris was presented to a U.S. Magistrate Judge in the Eastern District of Virginia, who temporarily placed Ms. Farris into the custody of USMS for purposes of transporting her to this District.

Ms. Farris presented for her initial appearance in this courthouse on Monday August 17, 2026. During that hearing, the government moved for Ms. Farris's ongoing detention pending trial and requested a detention hearing pursuant to 18 U.S.C. § 3142(f)(2)(A), arguing that the case involved a "serious risk" that Ms. Farris will flee. In response, the defense contested that proposition, especially considering that Ms. Farris had just turned herself into law enforcement the very morning after the charged conduct. Ultimately, after a lengthy presentation from the government—which included arguments based on evidence extracted from Ms. Farris's phone pursuant to an authorized search warrant—the Court denied the government's motion for a detention hearing. Instead, it released Ms. Farris on conditions of release that were recommended by the Pretrial Services Agency for the District of Columbia and agreed to by the defense,

including that Ms. Farris: promptly return to the Toledo, Ohio area where she has more stable residential and family ties, report to supervision with the Pretrial Services Agency for the Northern District of Ohio, stay away from the Washington, D.C. area except for required court appearances, and other relatively standard conditions. (ECF No. 10.)

Again, the Court set forth its reasoning in detail on the record during the hearing. Once the Court ruled, the government moved orally for an emergency stay so it could pursue an appeal with the Chief District Judge. The Court denied the stay request from the bench. Thereafter, the government did not immediately appeal, choosing instead to seek reconsideration with the undersigned. (ECF No. 11.) The Court denied the reconsideration motion by Minute Order.

The Court now issues this Memorandum Order to supplement its reasoning for denying the government's motion for a detention hearing under 18 U.S.C. § 3142(f)(2)(A).

## DISCUSSION

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "The Bail Reform Act of 1984 authorizes one of those carefully limited exceptions." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021). Through that statute, Congress provided that federal courts should convene a hearing on pretrial detention in certain types of cases; even then, courts should order detention before trial only if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Simply put, pretrial detention is not automatic—far from it.

More than that, and relevant here, even the occurrence of a detention hearing is not automatic. The Bail Reform Act provides for two general paths to a detention hearing. Through the first path, the government can obtain a detention hearing in certain cases based on the specific

type of offense involved—*e.g.*, cases that involve crimes of violence, offenses with a maximum sentence of life imprisonment or death, drug-related offenses with a maximum term of imprisonment of at least ten years, felony offenses involving a minor victim or the possession or use of a firearm, and other enumerated categories. 18 U.S.C. § 3142(f)(1)(A)–(E). Through the second path, a court can convene a detention hearing in a case that involves a "serious risk that [the defendant] will flee" or "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." *Id.* § 3142(f)(2)(A)–(B). These are the only paths to a detention hearing authorized by the Bail Reform Act. *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) (explaining that "a judicial officer must find one of [the] circumstances triggering a detention hearing" under Section 3142(f) because "[a]bsent one of these circumstances, detention is not an option"); *see also United States v. Morgan*, 2014 WL 3375028, at *2–4 (C.D. Ill. July 9, 2014) (collecting cases standing for the same proposition). Outside those enumerated circumstances, the government is not automatically entitled to a detention hearing in any case it wishes. *See also United States v. Martinez-Cermeno*, 2025 WL 327832, at *1 (N.D. Ill. Jan. 29, 2025) (walking through this same analysis and explaining that Congress "did not provide that [c]ourts always must conduct detention hearings whenever the government requests one").

Finally, even without convening a detention hearing, courts can still impose release conditions on a defendant awaiting trial to the extent necessary to "reasonably assure the appearance of the person as required" or mitigate any risk to "the safety of any other person or the community." 18 U.S.C. § 3142(c)(1). But in fashioning any such conditions, the court should impose the "least restrictive" conditions necessary to achieve those goals. *Id.* § 3142(c)(1)(B).

* * *

In this case, the government cannot seek a detention hearing under subsection (f)(1) of the Bail Reform Act because the property-destruction offenses with which Ms. Farris is charged are not among those enumerated by the statute as triggering an entitlement to a hearing. She is not charged, for instance, with a crime of violence, a felony involving a minor victim or a firearm, or any of the other categories of offenses specified in subsection (f)(1). That leaves the government to press for a detention hearing on the basis that the case "involves a serious risk that [Ms. Farris] will flee," as contemplated by subsection (f)(2)(A).[1]

So what is a "serious risk of flight" in this context? For starters, the term "serious" must carry some weight in the analysis because Congress chose to use that specific modifier in subsection (f)(2)(A), but not when addressing related questions of flight and nonappearance in other subsections of the Bail Reform Act. *Compare id.* § 3142(f)(2)(A), *with id.* § 3142(d)(2) (allowing for temporary detention in some circumstances where a judicial officer finds that a defendant "may flee"), *and id.* § 3142(e)(1) (allowing for pretrial detention after a hearing if a judicial officer "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required"). As another court recently put it, "Congress's deliberate use of the adjective 'serious' to modify 'risk of flight' further heightens the threshold" necessary to trigger a detention hearing, "given that the adjective does not appear in other parts of the Bail Reform Act." *United States v. Mejias-Mejias*, 771 F. Supp. 3d 688, 691 (D. Md. 2025) (quoting *United States v. Rodriguez-Fuentes*, 2025 WL 711955, at *2 (E.D. Ky. Mar. 5, 2025)). And this makes sense as a practical matter because virtually "*every* case involves some degree of flight risk, and [yet] the Bail Reform Act nevertheless favors release." *United States v. White*, 2021 WL

[1] The government did not argue that the case presents a "serious risk" of obstruction of justice or threat to any witness or juror, *see* 18 U.S.C. § 3142(f)(2)(B), and the Court does not see any independent basis to be especially concerned along those lines, so its analysis focuses on serious risk of flight.

2155441, at *12 (M.D. Tenn. May 27, 2021); *see also United States v. Runsdorf*, 2022 WL 303548, at *4 (S.D. Fla. Jan. 24, 2022) (similar).

Based on its review of the caselaw, this Court borrows language used by several other courts in framing the necessary showing: "a 'serious risk of flight' under § 3142(f)(2)(A) is a great risk—beyond average—that the defendant will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision." *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d 1131, 1138 (D. Idaho 2023); *accord United States v. Molina-Orantes*, 798 F. Supp. 3d 1204, 1214 (D. Or. 2025); *United States v. Romero-Martinez*, 2024 WL 965150, at *4 (D. Conn. Mar. 6, 2024); *see also Rodriguez-Fuentes*, 2025 WL 711955, at *2 (finding that subsection (f)(2)(A) requires "more than mere uncertainty or the possibility of nonappearance" but rather a "substantial" risk that a "defendant will take deliberate, voluntary action to flee to evade judicial oversight"); *United States v. Andrade-Aguilera*, 2026 WL 915669, at *3 (E.D. Tenn. Apr. 1, 2026) (similar). In analyzing whether the government has made this required showing, the Court is not restricted to any rigid test, but it is mindful that other courts have looked to factors such as a defendant's past efforts to evade arrest or law enforcement, a defendant's incentive and ability to flee, unstable residential ties to a community, and other similar considerations. *See Mejias-Mejias*, 771 F. Supp. 3d at 691 (citations omitted).

* * *

Applying these principles here, the Court concludes the government fails to sufficiently show that this case presents a "serious risk that [Ms. Farris] will flee." § 3142(f)(2)(A).

Given that the Court must focus on whether there is a serious risk that Ms. Farris will take active steps to avoid court proceedings and judicial oversight, it begins with an important fact that the government largely tries to avoid: Ms. Farris's voluntary surrender to law enforcement last

Friday. The very morning after she reportedly vandalized the World War II Memorial—less than twenty-four (24) hours later, and seemingly before this Court even issued a warrant for her arrest—Ms. Farris turned herself in to U.S. Marshals at a federal courthouse. As plenty of courts have recognized, a defendant's self-surrender to authorities typically cuts against a risk-of-flight finding. *See, e.g.*, *United States v. Doost*, 2025 WL 1555157, at *3 (D.D.C. June 2, 2025) ("A significant factor weighing against any finding that [the defendant] presents a flight risk is that he voluntarily surrendered to federal agents soon after being notified of the pending warrant for his arrest."); *United States v. Djoko*, 2019 WL 4849537, at *3 (W.D. Wash. Oct. 1, 2019) (finding no basis for detention hearing under Section 3142(f)(2)(A) because, among other reasons, the defendant "voluntarily surrender[ed] to authorities"); *United v. Fiandor*, 874 F. Supp. 1358, 1361 (S.D. Fla. 1995) ("A defendant's voluntary surrender undoubtedly is probative of whether he or she presents a flight risk."); *cf. Munchel*, 991 F.3d at 1285 (Katsas, J., concurring in part and dissenting in part) ("[B]oth [defendants] voluntarily surrendered to the FBI, as the district court recognized in concluding that neither posed a flight risk."). This same takeaway applies here. To state the obvious, a defendant who voluntarily (and rather quickly) surrenders to law enforcement—at a federal courthouse, no less—is far more likely to be someone who continues to appear for further court proceedings, rather than someone who presents a risk—much less a "serious" risk, as the statute requires—that they will flee from judicial oversight or supervision.

The government attempts to downplay the significance of Ms. Farris's surrender by pointing to evidence that in the hours after her alleged vandalism, she apparently researched ways to travel to Toledo, Ohio. (Ms. Farris had reportedly been staying in the Washington, D.C. area without housing for several weeks, but she has family and more stable residential ties in the Toledo area.) More specifically, the government proffered that in the afternoon and evening hours of

August 13, 2026, Ms. Farris conducted internet searches on her phone for directions to Ronald Reagan National Airport and for bus schedules and a bus ticket to Toledo. As the government paints things, these internet searches are evidence that Ms. Farris *already* tried to flee. But not really. Because whatever Ms. Farris might have looked up on her phone in the afternoon or evening of August 13, the reality is that she did not leave the D.C. area or otherwise try to evade law enforcement after she was accused of engaging in the offense conduct. To the contrary, the very next morning, she presented herself at a federal courthouse and turned herself in to U.S. Marshals. If the Court were viewing Ms. Farris's search history in a vacuum, it might weigh more heavily the government's concerns about that evidence. But the Court has to consider the relevant facts holistically, not in isolation. And that Ms. Farris promptly surrendered to law enforcement—apparently even believing she was likely to be sent to jail, given some of her comments in videos posted on social media—undercuts any argument that her apparent travel-related searches the day before should be viewed as strong evidence that she presents a serious risk of flight.

Undeterred, the government tries to analogize this case to *United States v. Grabinski*, 2025 WL 819570 (D.D.C. Mar. 13, 2025). Relevant to the government's argument, after the charges in *Grabinski* were dismissed without prejudice for violation of the Speedy Trial Act, the case was re-indicted on identical charges, at which point the defendant turned himself in after learning about his arrest warrant. *See id.* at *1–2. According to the government, the defendant in *Grabinski* similarly emphasized his voluntary surrender as an argument against detention, but Judge Richard Leon was unpersuaded. That point is true as far as it goes. But *Grabinski* was a very different case. For one, Mr. Grabinski was detained on basis of dangerousness, not simply flight risk. For another, the government was clearly entitled to a detention hearing in *Grabinski* under Section 3142(f)(1)(A) based on the charged offenses, which included a charge of attempted arson under

18 U.S.C. § 844(i) stemming from the defendant allegedly throwing a Molotov cocktail (unlit) into the Chinese Embassy in Washington, D.C. After such a hearing, Judge Leon concluded that he could not fashion conditions of release to reasonably protect the safety of the community and detained on that basis. But even in the full detention-hearing context, his ruling was not focused heavily on risk flight, and it certainly did not consider how the defendant's self-surrender might have influenced that consideration—let alone at the threshold stage requiring a "serious" flight risk. So even assuming the government is not attempting to equate the throwing of a Molotov cocktail into a foreign embassy (as charged in *Grabinski*) with the spray painting of a veterans' memorial (as charged here), *Grabinski* is little help to the government's effort to undercut the evidentiary weight of Ms. Farris's voluntary surrender to authorities in this case.

Next, the government argues that Ms. Farris presents a serious flight risk because she has no ties to the Washington, D.C. community. Ms. Farris responds by pointing to more concrete ties in the Toledo, Ohio area, where she has stable housing along with family and community support. And Ms. Farris plans to return to Toledo and remain there while her case is pending (which the Court is ordering that she do, as explained below). Given Ms. Farris's ties to another community in a relatively nearby state, her lack of community ties in this District is less concerning to the Court from a risk-of-flight perspective. As another court explained it, "[t]he fact that [she] lacks community ties specifically in this district … is not very probative of whether [s]he would intentionally not show up here and instead choose the path of a fugitive." *White*, 2021 WL 2155441, at *14. After all, "the risk at issue here is risk of *flight*," and "to the extent that a defendant has community ties *somewhere* in this country, [they are] less likely to choose the path of a fugitive reflected by a decision intentionally not to appear in court in a federal criminal case wherever it is pending." *Id.* If anything, given the nature of Ms. Farris's charged offenses, the Court believes it

far better for her to remain outside the District of Columbia—and away from other federal monuments and memorials—while she awaits trial. And while Ms. Farris's unhoused status during her recent presence in this District over the last several weeks might present certain additional challenges, the fact that she has a more stable set-up in Ohio—with nearby family support and related assistance—goes a long way toward mitigating any such challenges.

Finally, the government argues that Ms. Farris has a history of noncompliance with court orders related to a few prior offenses out of Michigan and Ohio, including a 2005 conviction for misdemeanor marijuana possession, a 2011 conviction for driving while impaired, and a 2015 conviction for disorderly conduct. According to the government, Ms. Farris incurred several probation violations in connection with those charges, including a bench warrant for non-appearance that reportedly remained outstanding for several months. This Court, to be clear, takes seriously the need to comply with court-ordered conditions, and it understands the government's argument that Ms. Farris's past alleged non-compliance reflects a risk of future non-compliance. But in the present posture, the Court is focused on whether Ms. Farris presents a *serious* risk of *flight*, and it simply cannot conclude that her reported missteps on probation more than a decade ago suffice to make that showing, especially given her recent surrender at a federal court.

For these reasons, the Court finds that the government fails to show that this case presents a serious risk of flight, which means that it is not entitled to a hearing on the issue of whether Ms. Farris should be detained in jail while she awaits trial. *See* 18 U.S.C. § 3142(f)(2)(A).[2]

* * *

[2] Toward the close of the hearing, counsel for Ms. Farris suggested that the Court could simply assume the right to a detention hearing and analyze the Section 3142(g) factors to evaluate whether Ms. Farris presented a risk of non-appearance or flight so great that the Court could not mitigate it with conditions. While the Court appreciates the practicality of that approach—and defense counsel's effort to streamline things—the Court is not generally in the habit of honoring statutes in the breach. If the government is not entitled to a detention hearing, the inquiry ends there. And that is the Court's conclusion in this case.

Even though the Court found no basis to convene a detention hearing, it still considered and ultimately adopted the recommended conditions of release proposed by the Pretrial Services Agency for the District of Columbia, which are fully set forth in a separate order. At a high level, the Court ordered that Ms. Farris return to the Toledo, Ohio area and report to the Pretrial Services Agency for the Northern District of Ohio by no later than Thursday August 20, 2026, and to undergo a mental health screening as directed by Pretrial Services and to follow any recommended referral for mental health services. Ms. Farris is restricted from traveling outside the general Toledo, Ohio area without advance approval by Pretrial Services. In addition, the Court ordered Ms. Farris to stay away from the District of Columbia (and, by implication, the World War II Memorial—and any other memorials) pending the completion of this case except for court-related appearances. The Court required that she surrender any passports or international travel document, that she not possess any firearms or other weapons, and that she not use or unlawfully possess any narcotic drug or other controlled substance.

Beyond those restrictions, the government asked the Court—in the alternative to holding Ms. Farris in jail while her case proceeds—to impose GPS location monitoring and appoint a third-party custodian. The Court declined to adopt those conditions because it is required to impose the "least restrictive" conditions necessary, and it believes that those additional conditions are more restrictive than necessary given the overall backdrop of the case.

## CONCLUSION

Many Americans—particularly veterans and those with close ties to veterans—are rightly upset by what Ms. Farris is charged with doing to the World War II Memorial. The Court's ruling today, however, focuses strictly on the narrow and preliminary question of whether the government can hold her in jail while she awaits trial on the charges. On that score, the U.S. Supreme Court

has described pretrial detention as a “carefully limited exception,” *Salerno*, 481 U.S. at 755, which means that this Court—like all federal courts—has “a grave constitutional obligation to ensure that the facts and circumstances of each case warrant this exceptional treatment.” *Munchel*, 991 F.3d at 1285. For the reasons explained, this case does not.

Accordingly, the government’s motion for a detention hearing is **DENIED**.

Dated: August 18, 2026

MATTHEW J. SHARBAUGH
United States Magistrate Judge